**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ )<br>In re SEIZURE OF APPROXIMATELY )<br>$12,116,153.16 AND ACCRUED )<br>INTEREST IN U.S. CURRENCY, *et al.* )<br> )<br>_____) | Misc. Action No. 08-261<br>(RMC) |

### OPINION

  The United States Government submits a renewed application to register and enforce restraining orders issued by courts in the Federative Republic of Brazil, to preserve assets of persons being criminally prosecuted in Brazil.  The Renewed Application is presented pursuant to 28 U.S.C. § 2467(d)(3)(A), as amended by the Preserving Foreign Criminal Assets for Forfeiture Act of 2010, P.L. No. 111-342.  The restraining orders are intended to preserve assets located in the United States until final forfeiture judgments are issued by Brazilian courts and presented for execution here.  As explained below, the restraining orders will be enforced.

### I.  FACTS

  The Government seeks to register and enforce restraining orders issued by Brazilian courts, to preserve $11,372,844.19, plus accrued interest, held in the following eleven accounts:

  1.  $1,343,746.05 formerly in account 45200483, and known as the Chettair Business, Inc. Account (Chettair Account), held in the name of and for the benefit of Janine Ribiero and Joacyr Reinando;

  2.  $1,510,379.08 formerly in account 9006863, and known as the Farswiss Asset Management Ltd. Account (Farswiss Account), held in the name of and for the benefit of Ruy Ulhoa Cintra de Araujo;

  3.  $84,260.01 formerly in account 9004008, and known as the Harborside Corporation Account (Harborside Account), held in the name of and for the benefit of Joao Carlos da Cunha Canto Kneese and Ronaldo Speiss Fernandes

Cortez;

4.  $285,945.16 formerly in account 9009570, and known as the Safeport Investment Corporation Account (Safeport Account), held in the name of and for the benefit of Joao Carlos da Cunha Canto Kneese and Ronaldo Speiss Fernandes Cortez;

5.  $237,829.82 formerly in account 9004681, and known as the Tigrus Corporation Account (Tigrus Account), held in the name of and for the benefit of Pompeu Costa Lima Pinheiro Maia;

6.  $86,401.27 formerly in account 9200172, and known as the Pompeu Maia Account (Maia Account), held in the name of and for the benefit of Pompeu Costa Lima Pinheiro Maia;

7.  $1,026,455.90 formerly in account 45200491, and known as the Avion Resources Ltd. Account (Avion Account), held in the name of and for the benefit of Gustavo Zerfan Harber and Michael Homci Harber;

8.  $2,675,387.73 formerly in account 9008295, and known as the Gatex Corporation Account (Gatex Account), held in the name of and for the benefit of Antonio Pires De Almeida;

9.  $1,698,878.23 formerly in account 9006556, and known as the Harber Corporation Account (Harber Account), held in the name of and for the benefit of Antonio Pires De Almeida;

10.  $800,968.88 formerly in account 9007663, and known as the Mabon Corporation Account (Mabon Account), held in the name of and for the benefit of Elcio Areias and Antonio Carneiro; and

11.  $1,624,717.06 formerly in account 9010133, and known as the Midland Financial, Inc. Account (Midland Account), held in the name of and for the benefit of Henrique Lamberti and Marianel Gandolfo Miranda.

These eleven bank accounts are collectively referred to here as the "Accounts."  The individuals, who were signatories on the Accounts, owned or controlled the Accounts and are referred to as the "Beneficial Owners."  The corporations named on the Accounts — Chettair, Farswiss, Harborside, Safeport, Tigrus, Avion, Gatex, Harber, Mabon, and Midland — are offshore

companies, incorporated in the British Virgin Islands.  Application [Dkt. 1] at 10-15.  The
Accounts were held at the Valley National Bank (formerly Merchants Bank) in New York.

The Beneficial Owners[1] of the Accounts are defendants in criminal prosecutions
in Brazil.  *See* Reply [Dkt. 80], Ex. 1 (Dallagnol Aff.)[2] ¶ 6 (summarizing the Brazilian criminal
proceedings involving the Accounts).  Because corporations are not subject to criminal
prosecution in Brazil, *see* Opp. [Dkt. 69], Ex. A (Mottola Aff.)[3] ¶ 17, the corporations named on
the Accounts are not defendants in the prosecutions in the Brazilian courts.

As part of those criminal prosecutions, the Accounts are subject to eight
restraining orders issued by courts in Brazil.  *See* Renewed App. [Dkt. 59], Exs. A-H (Brazilian
Restraining Orders); *see also* Dallagnol Aff., Att. A (Order of Court of the First Instance in Sao
Paulo ratifying restraining order against the Harborside and Safeport Accounts).   The
Government filed this suit seeking to register and enforce restraining orders issued by the
Brazilian courts (including the Brazilian Restraining Orders at issue here), and the Court issued a
restraining order.  *See* Restraining Order [Dkt. 2].[4]  Due to intervening circumstances described

---

[1] None of the criminal defendants in Brazil is a U.S. citizen.  They are Brazilian citizens or
residents, with the exception of Marianel Gandolfo Miranda who is a Uruguayan citizen and
resident.

[2] Deltan Marinazzo Dallagnol is a prosecutor in Brazil.  A court may rely on information "set
forth in an affidavit describing the nature of the proceeding or investigation underway in a
foreign country, and setting forth a reasonable basis to believe that the property to be restrained
will be named in a judgment of forfeiture at the conclusion of such proceeding."  28 U.S.C.
§ 2467(d)(3)(B).

[3] Fernanco Mottola is a former Brazilian judge.

[4] The original Order enforcing the Brazilian restraining orders, *see* Order [Dkt. 2], included
thirteen bank accounts, but the matter has been resolved as to the Accounts of Piedade Pedro
Almeida and Fares Baptista Pinto.  *See* Consent Order [Dkt. 44] (lifting the restraint on account

below, the U.S. Government now has filed a Renewed Application for registration and

enforcement of the Brazilian Restraining Orders — in essence seeking the continued restraint of

the Accounts — based on the alleged involvement of each Account, of the Beneficial Owners,

and of the offshore corporations named on the Accounts, in a criminal money laundering

scheme.

The United States and Brazil are parties to a Mutual Legal Assistance Treaty

(MLAT), whereby the United States is obligated, *inter alia,* to assist Brazil in forfeiture matters.

*See* Treaty on Mutual Legal Assistance in Criminal Matters, U.S. – Brazil, Oct. 14, 1997, S.

Treaty Doc. No. 105-42 (ratified by U.S. Sept. 28, 1998).  On February 12, 2008, Brazil sent a

formal MLAT request to the United States, seeking enforcement of its courts' restraining orders

on the Accounts, including the Brazilian Restraining Orders at issue here.

The MLAT request arose from the Brazilian prosecution of numerous individuals

including the Beneficial Owners.  The individuals were known as "doleiros," meaning dollar

dealers, and were named in the MLAT.  An investigation conducted by the "Banestado Task

Force" had found that certain doleiros that had accounts at Merchants Bank were receiving funds

from known drug organizations operating in South and North America.  The doleiros accepted

cash from customers in Brazil and transmitted the funds to Maria Carolina Nolasco, a former

---

9204181 in the name of Fares Baptista Pinto (Baptista Pinto Account); Order [Dkt. 60]
(enforcing restraining order as to account 8200875 in the name of Piedade Pedro Almeida in
light of a final Brazilian forfeiture judgment).  Also, pursuant to a consent order, some of the
funds were released from the Mabon, Gatex, and Harber Accounts.  *See* Order [Dkt. 50] (consent
order releasing certain funds sufficient to pay attorney's lien).  As a result of these developments,
the amount the Government seeks to restrain has been reduced from the original amount of over
$12 million.  While the Consent Order that lifted the restraint on the Baptista Pinto Account also
lifted the restraint on the Avion Account, *see* Consent Order [Dkt. 44], in the Renewed
Application the Government again seeks to restrain the Avion Account.

assistant vice president at Merchants Bank.  From time to time, the doleiros directed Ms. Nolasco

to transfer funds to other accounts, attempting to create the appearance of legitimate business

activity.  Brazil alleges that the corporations that are named on the Accounts had no legitimate

business activities.

Ms. Nolasco was indicted in the United States and, on October 4, 2004, pleaded

guilty to charges of operating an unlicensed money remitter business in violation of 18 U.S.C.

§ 1960 and to charges of tax evasion.  *See United States v. Nolasco*, Crim. No. 04-617 (D.N.J.).

In her plea agreement, Ms. Nolasco admitted that all of the Accounts were involved in an offense

in violation of 18 U.S.C. § 1960 or are traceable to such property, and thus are subject to

forfeiture.  *Id.*, Plea Agreement [Dkt. 26] at 4.  In the course of the criminal prosecution of Ms.

Nolasco, the U.S. District Court for the District of New Jersey issued seizure warrants for more

than $21 million located in U.S. bank accounts, including the Accounts at issue here.  In

December 2004, a consent judgment of forfeiture was entered, but account holders filed claims

for the return of the funds.  The District of New Jersey granted summary judgment to the account

holders, finding that the funds were not properly forfeited because Ms. Nolasco had no legal

interest in them.  *See id.*, Order [Dkt. 153], Am. Order [Dkt. 154], Order Releasing property

[Dkt. 157].  Before the funds were released, however, the New York County Attorney's Office

initiated a state civil forfeiture action and obtained a writ of attachment on the Accounts.  *See*

Mot. to Intervene [Dkt. 7] at 7-8.  Litigation ensued, but eventually the New York forfeiture case

was dismissed as moot because the funds were transferred out of New York's jurisdiction to the

United States pursuant to the MLAT request.  *Id.*

The Beneficial Owners allegedly operated the Accounts and effectively controlled the offshore corporations in whose name the Accounts were opened.  The Brazilian government asserts that the corporations were shell corporations, mere fronts for illegal activity by the Beneficial Owners.  Dallagnol Aff. ¶ 5(19).  In Brazil, the Beneficial Owners are charged with violations of Brazilian criminal laws against the operation of illegal or unlicensed financial institutions, conspiracy to commit criminal financial activity, and the laundering of proceeds of crime.  *See generally* Dallagnol Aff. ¶ 6; Brazilian Restraining Orders.  Specifically, the Beneficial Owners are charged with the following crimes:  Brazilian Law 7492/86, Art. 4 (prohibiting fraudulent operation of a financial institution); Art. 16 (prohibiting operation of an unauthorized financial institution); Art. 22, (prohibiting unauthorized money exchange operations); Brazilian Law 9613/98, Art. 1 (prohibiting concealment and disguise of the true nature, origin, location, disposition, movement, or ownership of assets that result from acts against the Brazilian financial system); and Brazilian Penal Code § 288 (criminal conspiracy).  *See, e.g.*, Renewed App., Ex. B at 1.

The Brazilian authorities allege that the Accounts are subject to forfeiture because Brazilian law provides that property involved in money laundering is subject to prejudgment restraint and later forfeiture.  *See* Gov't Opp. [Dkt. 10], Ex. 3 (Aras Aff.) [5] ¶¶ 62, 64.  If the Beneficial Owners are convicted of the crimes charged, the Brazilian courts may order the Beneficial Owners to forfeit an amount equal to the sum of all the offenses committed and all funds used to commit the offenses charged.  *Id*. ¶ 66.  Under Brazilian law, a court can order the

---

[5] Vladimir Aras is a prosecutor in Brazil.

provisional restraint of assets owned by an accused where a forfeiture order is likely.  *Id*. ¶¶ 64-

65.  Brazilian Prosecutor Dallagnol further explains:

> (10) According to Article 91 (item II, letter b) of the Brazilian Criminal
> Code, the forfeiture of the economic products and profits produced by the
> crime is an effect of the criminal conviction.  Likewise, under Article 7
> (item I) of the Money Laundering Act (Law # 9.613/98), goods, rights,
> and values that are the object of money laundering must be forfeited, as a
> result of the criminal conviction.  Both acts, however, protect the right of
> victims and owners of property who have acted in good-faith.
>
> (11) One of the means granted by the Brazilian Law to seize assets that
> can be object of future forfeiture is the sequestration.  Pursuant to Article
> 126 of the Brazilian Code of Criminal Procedure, the requisite of the
> sequestration consists of vehement indicia of the illegal origin of the
> assets.  Under Article 4 of the Money Laundering Act, the requisite of the
> apprehension consists of enough indicia that the assets are object of
> money laundering.  Traditionally, in both cases, the existence of evidence
> of a probable cause is required.
>
> (12) The sequestration, under Brazilian Law, is possible whenever there is
> a crime that bore assets.  There are no distinctions among crimes, since
> they have produced ill-gotten assets.  Therefore, it is not important who is
> in possession of the assets when they are seized, but what is their origin.
>
>  . . . .
>
> (15) After the seizure of assets, although it is not necessary, the
> prosecutor's office includes a request for their forfeiture in the petition in
> which the formal charges are presented to the Judge.  In the Merchants
> Bank Case, this occurred.

Dallagnol Aff. ¶¶ 5(10)-(12), (15).  Brazilian law provides for a "double degree of jurisdiction,"

whereby after a sentence is imposed by the first trial court, the parties can appeal and the court of

appeals reviews de novo both the facts and the law; in essence, this first appeal gives a defendant

a right to a second trial.  *Id*. ¶ 5(4).  The cases are subject to three levels of appeal before a final

judgment of conviction and forfeiture is entered.  *Id*.; Status Report [Dkt. 13] at 7.

While the Brazilian Restraining Orders remain in place, the prosecutions of the Beneficial Owners of the Accounts are continuing and the Brazilian courts have not entered any final judgments of either acquittal or conviction. The status of the Brazilian prosecutions is as follows:[6] Brazilian prosecutors have obtained convictions of Pompeu Costa Lima Pinheiro Maia (Beneficial Owner of the Maia and Tigrus Accounts) and Janine Ribiero and Joacyr Reinando (Beneficial Owners of the Chettair Account). *See* Dallagnol Aff. ¶¶ 6(1), (4). The Brazilian courts thus have entered sentencing decisions ordering forfeiture of the Maia, Tigrus, and Chettair Accounts. *Id*. Similarly, Brazilian prosecutors obtained convictions of Ruy Ulhoa Cintra de Araujo and others with a legal interest in the Farswiss Account, and the Brazilian court ordered that the Farswiss Account be forfeited. Reply [Dkt. 83], Ex. 2 (Martello Aff.)[7] at 9. Although the courts entered judgments of convictions and forfeiture against these individuals, the convictions and forfeitures are not *final* because appeals are pending. *Id*. at 10; Dallagnol Aff. ¶¶ 6(1), (4).

The Brazilian trial court acquitted the Beneficial Owners of the Avion Account, Gustavo Zerfan Harber and Michael Homci Harber. However, the prosecutor appealed, and thus there is no final judgment in that case. Dallagnol Aff. ¶ 6(5). With regard to the Midland Account and Beneficial Owners Henrique Lamberti and Marianel Gandolfo Miranda, the Brazilian prosecution is currently suspended due to the defendants' challenge to service of process. *Id*. ¶ 6(3). Messrs. Lamberti and Gandolfo Miranda live in Uruguay. It is anticipated

---

[6] Because the Gatex, Harber, and Mabon corporations have not filed objections to the Renewed Application to enforce the Brazilian Restraining Orders, the status of the Brazilian prosecutions of the Beneficial Owners of these accounts is not reported here.

[7] Leticia Pohl Martello is a prosecutor in Brazil.

that when the service issue is resolved, the prosecution will resume. *Id.* As to the Harborside and Safeport Accounts, the Brazilian court voided the prior criminal conviction of Beneficial Owner Mr. da Cunha Canto Kneese[8] due to improper venue. The court transferred the case to the proper venue, and the transferee court ratified the restraining order previously issued against the Harborside and Safeport Accounts. Dallagnol Aff., Att. A (Order of Court of the First Instance in Sao Paulo, dated June 22, 2011). The issue of Mr. da Cunha Canto Kneese's guilt remains pending. *See* Dallagnol Aff. ¶¶ 3(4), 6(2).[9]

As noted above, the offshore corporations named on the Accounts cannot be subject to criminal prosecution in Brazil. *See* Mottola Aff. ¶ 17. Even so, the corporations may contest the restraint of property in which they claim an interest in Brazilian courts. *See* Dallagnol Aff. ¶¶ 5(10), (14), (17), (18). So far, they have not done so. *Id*. ¶ 5(18).

The Government originally filed this suit on April 25, 2008, seeking to register and enforce restraining orders as requested in the MLAT. Four days later, the Court issued an

---

[8] The Renewed Application named as beneficial owners of the Harborside and Safeport Accounts Joao Carlos da Cunha Kneese and Ronaldo Speiss Fernandes Cortez. Subsequently, the Brazilian court has determined that the "real manager" of these accounts was Mr. da Cunha Canto Kneese. Dallagnol Aff. ¶ 6(2)(f).

[9] The Government has been surprisingly careless in its briefing. It has made multiple errors concerning the status of the underlying criminal cases and has failed to appreciate the specific facts set forth in its own filing, the Dallagnol Affidavit. For example, the Government asserts that the Farswiss conviction was a "final" order, when it was still subject to appeal. *Compare* Renewed App. at 9 n.2 *with* Dallagnol Aff. ¶ 6(1), 6(4). The Government alleges that Mr. da Cunha Canto Kneese was convicted and the Harborside and Safeport Accounts were ordered forfeited, without acknowledging that the conviction was later voided and that prosecution was resumed in a new venue. *Compare* Reply [Dkt. 80] at 15, 17 and Reply [Dkt. 81] at 11 n.9 *with* Dallagnol Aff. ¶¶ 3(4), 6(2). Also, the Government reports that Isabel Cristina Dutra Pinheiro Maia (a signatory on the Tigrus Account, *see* Application [Dkt. 1] at 15), was convicted, when the Dallagnol Affidavit indicates that she was acquitted. *Compare* Reply [Dkt. 81] at 11 n.9 *with* Dallagnol Aff. ¶6(4)(i).

order restraining various accounts, including the Accounts at issue here. *See* Restraining Order [Dkt. 2]. Formal notice was provided to interested persons located in Brazil and to the offshore corporations via their registered agents. *See, e.g.*, Status Reports [Dkt. 5, 13, 25, 31, 32].

In 2010, the D.C. Circuit ruled in a different case that 28 U.S.C. § 2467(d)(3) did not allow restraint of assets in the United States that had not yet been the subject of a final judgment of forfeiture in a foreign country. *See In re Brown Bros. Harriman & Co. Account No. 8870792 in the name of Tiger Eye Inv. Ltd.*, 613 F.3d 1122, 1126-27 (D.C. Cir. 2010) ("*Tiger Eye*"). In recognition of the ruling in *Tiger Eye*, the Government moved to amend this Court's restraining order to continue the restraint on Accounts already named in final Brazilian forfeiture judgments and to release other Accounts as to which final judgment had not yet been obtained in Brazil. Mot. to Amend [Dkt. 37]. Congress then amended 28 U.S.C. § 2467(d)(3), and the Government submitted the Renewed Application now before the Court. In light of the Renewed Application, the Court denied as moot the Government's motion to amend. *See* Minute Order (Feb. 24, 2011).

The following Beneficial Owners and corporations named on the Accounts have intervened in this matter and have filed objections to the Government's Renewed Application: Chettair Business, Inc., Harborside Corporation, Safeport Investment Corporation, Midland Financial, Inc., Avion Resources Ltd, Tigrus Corporation, Pompeu Costa Lima Pinheiro Maia, Isabel Cristina Maia, and Farswiss Asset Management Ltd. (collectively "Intervenors"). *See* Intervenors' Opps. [Dkts. 69, 70, 79]. The Intervenors joined in each of the others' objections. The Gatex, Harber, and Mabon Corporations have not filed any objections to the Renewed Application.

10

## II.  LEGAL STANDARD

The Renewed Application to enforce the Brazilian Restraining Orders is brought under the federal law that governs the enforcement of foreign judgments, 28 U.S.C. § 2467(d)(3), as amended by the Preserving Foreign Criminal Assets for Forfeiture Act of 2010 ("2010 Amendment").  Before the 2010 Amendment, 28 U.S.C. § 2467(d)(3) provided:

> (d) Entry and enforcement of judgment. —
>
> (3) Preservation of Property. —
>
> (A) In general.  To preserve the availability of property *subject to a foreign forfeiture or confiscation judgment*, the Government may apply for, and the court may issue, a restraining order pursuant to section 983(j) of title 18, at any time before or after an application is filed pursuant to subsection (c)(1) of this section.

28 U.S.C. § 2467(d)(3)(A) (emphasis added) (pre-2010 version).  Critically, the 2010 Amendment rewrote subsection (A), that part of the statute that *Tiger Eye* had ruled allowed only post judgment restraining orders.  As amended, 28 U.S.C. § 2467(d)(3)(A) now reads:

> (d) Entry and enforcement of judgment. ---
>
> (3) Preservation of Property. ---
>
> (A) Restraining order. ---
>
> (i) In general.  To preserve the availability of property *subject to civil or criminal forfeiture under foreign law*, the Government may apply for and the court may issue a restraining order *at any time before or after the initiation of forfeiture proceedings* by a foreign nation.

28 U.S.C. § 2467(d)(3)(A) (emphasis added).

As the law now stands, a proceeding under 28 U.S.C. § 2467 ("§ 2647 Proceeding") to enforce and register a foreign restraining order arises from a foreign court's determination that property *may be* forfeited together with an official request by the foreign

11

nation to the United States to preserve the availability of the property in the United States during the foreign court proceeding.  As revised, 28 U.S.C. § 2467(d)(3)(A) is clear that a final judgment of forfeiture is not a prerequisite.  A U.S. court may enforce a restraining order on property subject to forfeiture "at any time before or after" the beginning of foreign forfeiture proceedings.

In a § 2647 Proceeding, a court may "register and enforce a foreign restraining order that has been issued by a court of competent jurisdiction in [a] foreign country and certified by the Attorney General."  28 U.S.C. § 2467(d)(3)(B).  Six criteria must be met before a court can enforce a foreign restraining order:

> (1) the United States and the foreign government that issued the restraining order are parties to a formal international agreement providing for mutual forfeiture assistance, *see id*. § 2467(a)(1);

> (2) the violation of foreign law giving rise to forfeiture would constitute a violation that would give rise to forfeiture if committed in the United States, *see id*. § 2467(a)(2) (known as the "dual forfeitability" requirement);

> (3) the Attorney General certifies that it is in the interest of justice to enforce the foreign order, *see id*. § 2467(b);

> (4) the foreign order was issued consistent with due process, *see id*. § 2467(d)(1)(A);

> (5) the foreign authority had subject matter jurisdiction to issue the restraint, *see id*. § 2467(d)(1)(C); and

> (6) there is no reason to believe the foreign order was obtained by fraud, *see id*. § 2467(d)(1)(E).[10]

---

[10] The fourth, fifth, and sixth requirements are made applicable to actions to enforce restraining orders pursuant to 28 U.S.C. § 2467(d)(3)(A)(ii)(I).

The Government argues that these six criteria have been met and that the Court should issue an order registering and enforcing the Brazilian Restraining Orders. *See* Renewed App. at 14-17. It notes: first, the United States and Brazil are parties to a formal MLAT; second, the underlying criminal conduct for these offenses, if committed in the United States, would violate U.S. criminal laws and would be subject to forfeiture; third, the Department of Justice certified that it is in the interest of justice for the United States to seek enforcement of the Brazilian Restraining Orders specified in the MLAT request;[11] fourth, the Brazilian prosecutions have sufficient due process protections; fifth, the Brazilian criminal courts had proper subject matter jurisdiction to issue the prejudgment retraining orders; and sixth, there is no contention that the Brazilian Restraining Orders were obtained by fraud.

Not assuaged, the Intervenors insist that their due process rights are violated by the enforcement of a foreign restraining order without a prerestraint hearing. They also contend the Government has not established dual forfeitability — *i.e.*, the Government has not presented sufficient evidence that the alleged violations of Brazilian law giving rise to forfeiture would constitute violations of U.S. law if committed here. Further, they argue that the Ex Post Facto Clause in the U.S. Constitution, U.S. Const. Art. I, § 9 cl. 3; *id.*, § 10 cl. 1, bars retroactive application of the 2010 Amendment. Finally, they contend that the Brazilian restraining order against the Harborside and Safeport Accounts is no longer valid and cannot be enforced.

---

[11] The Attorney General delegated certification authority to the Assistant Attorney General for the Criminal Division of the Department of Justice (DOJ). On April 17, 2008, the Assistant Attorney General for the Criminal Division of DOJ certified restraining orders for enforcement under § 2467(b)(3), and on February 11, 2011, recertified the Brazilian Restraining Orders under the statute as amended. *See* App., Ex. 1 (certification); Renewed App., Ex. 1 (recertification).

### III. ANALYSIS

#### A. Due Process

The Intervenors complain vehemently about the initial seizure of the Accounts by New York state courts, arguing that this violated due process.  They emphasize that the original forfeiture of the Accounts in the Nolasco prosecution was reversed (since Ms. Nolasco had no claim to the funds).  The Accounts originally were seized while the funds were under the jurisdiction of the State of New York and before they were transferred to the United States pursuant to the MLAT request.  The propriety of the actions of New York courts is not subject to review by this Court.  The only issue here is whether, under 28 U.S.C. § 2467, as amended, the Government is entitled to an order to register and enforce these Brazilian prejudgment restraining orders.  Notably, this is *not* a suit for forfeiture under U.S. law.

The Intervenors also raise arguments that pursuant to statute and the U.S. Constitution, they are entitled to a due process prerestraint hearing.  They claim that proceeding under 28 U.S.C. § 2467 (a "§ 2467 Proceeding") requires a prerestraint hearing because it states that "the procedural due process protections for a restraining order under section 983(j) of title 18" must be provided.  28 U.S.C. § 2467(d)(3)(A)(ii).  The argument has facial appeal but does not stand up upon scrutiny of the plain statutory language of § 983(j).

Section 983(j) of Title 18 provides:

(1) Upon the application of the United States, *the court may enter a restraining order* or injunction . . . or take any other action to seize, secure, maintain, or preserve the availability of property subject to civil forfeiture ---

(A) *upon the filing of a civil forfeiture complaint* alleging that the property with respect to which the order is sought is subject to civil forfeiture; *or*

(B) *prior to the filing of such a complaint,* if, *after notice* to persons appearing to have an interest in the property *and opportunity for a hearing*, the court determines that ---

(i) there is a substantial probability that the United States will prevail on the issue of forfeiture . . . . ; and

(ii) the need to preserve the . . . property . . . outweighs the hardship on any party against whom the order is to be entered.

18 U.S.C. § 983(j)(1) (emphasis added).  Section 983(j) speaks in terms of procedural steps for civil forfeiture to the United States.  In a § 2467 Proceeding, Congress has directed that "references in such section 983(j) to civil forfeiture or the filing of a complaint shall be deemed to refer to the applicable foreign criminal or forfeiture proceedings."  28 U.S.C. § 2467(d)(3)(A)(ii)(II)(aa).  Thus, the pendency of a foreign criminal proceeding satisfies the terms of 18 U.S.C. § 983(j), which permits a court to enter a restraining order *upon* the institution of foreign criminal or forfeiture proceedings.[12]  In the context of a § 2467 Proceeding, § 983(j) mandates a prerestraint hearing only when the Government seeks a restraining order *before* the institution of a foreign criminal or forfeiture proceeding.  *See In re Restraint of All Assets Contained or Formerly Contained in Certain Inv. Accounts at UBS Fin. Servs., Inc.*, No. 11-452, 2012 WL 1744463, *6 (D.D.C. May 17, 2012) (finding that the hearing required by 18 U.S.C. § 983(j) "only applies at the prefiling stage of foreign criminal or forfeiture proceedings and when there is no proceeding in which to challenge the restraint in the foreign country").  There is no dispute in this case that Brazilian prosecutors have instituted criminal proceedings against the Beneficial Owners of the Accounts.  Thus, there is no statutory requirement for a

---

[12]  *See also* 21 U.S.C. § 853(e)(1)(A) (in a criminal proceeding, a restraining order may be entered upon the filing of the indictment or information, without a prerestraint hearing).

prerestraint hearing on Intervenors' objections to registration and enforcement of the Brazilian Restraining Orders.

In addition to their statutory arguments, the Intervenors claim they have a constitutional right to a prerestraint hearing. They assert that the lack of a prerestraint hearing violates their rights under the due process clause of the Fifth Amendment. U.S. Const. amend. V (providing that no person "shall be deprived of life, liberty, or property, without due process of law . . . "). Due process mandates notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

To determine whether due process requires a hearing in a particular case, a court must examine the factors set forth in *Mathews v. Eldridge. United States v. E-Gold, Ltd.*, 521 F.3d 411, 415 (D.C. Cir. 2008); *see also United States v. Holy Land Found. for Relief and Dev.*, 493 F.3d 469, 475 (5th Cir. 2007) (citing cases). *Mathews v. Eldridge* defined the relevant factors for consideration as follows: (1) the private interest that will be affected by the restraint; (2) the risk of an erroneous deprivation of such interest through the procedures used; (3) the probable value, if any, of additional or substitute procedural safeguards; and (4) the Government's interest, including the burdens that the hearing would entail. *Holy Land*, 493 F.3d at 475 (citing *Mathews v. Eldridge*, 424 U.S. at 335). Thus, when the Government seeks to restrain assets in order to remove them from the control of a defendant, the due process clause comes into play and a predeprivation hearing "would normally be in order." *E-Gold*, 521 F.3d at 416-17. However, under extraordinary circumstances notice and a hearing may be postponed until after the deprivation. *Id*. at 417. Extraordinary circumstances exist, for example, where there is a need for prompt action (such as to freeze monies that could be quickly dissipated) and

there is an important government interest at stake (such as to separate a criminal from ill-gotten gains or to lessen the economic power of organized crime), leading courts to permit the restraint of assets without a prerestraint hearing.  *See id*. at 415-16 ("[I]n the case of a criminal proceeding in which the government may ultimately have rights in the property at issue, immediate protective measures must be taken in order to prevent dissipation or deterioration of the assets before the time for trial is reached.")  In contrast, in *United States v. James Daniel Good Real Property*, 510 U.S. 43, 52-57 (1993), the Supreme Court found that a hearing was required before real property could be restrained.  In that case, there were no exigent circumstances requiring immediate restraint of the real estate at issue because there was no evidence that the property would be sold or would deteriorate before a prerestraint hearing could be held.

Due process does not require a prerestraint hearing on an application to enforce a foreign restraining order in the extraordinary circumstances of this case.  The underlying criminal prosecutions already were initiated in Brazil.  The Accounts might be quickly dissipated if not restrained, and the assets are alleged to be the proceeds and instruments of crime.

While the Court will not grant a prerestraint hearing under the circumstances of this case, Intervenors also request a *post restraint* hearing.  *See* Opp. [Dkt. 70] at 9.  It is not clear whether Intervenors have a right to a post restraint hearing.  Due process does not *automatically* require a post restraint hearing, but one may be granted upon a properly supported motion.  *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998).

Courts have required a post restraint hearing when assets might be restrained for a long period of time.  In *United States v. Crozier*, 777 F.2d 1376 (9th Cir. 1985), the Ninth Circuit

required a post restraint hearing where assets were restrained and would continue to be restrained

for an extended period.  Emphasizing that due process requires an opportunity to be heard at a

meaningful time and in a meaningful manner, the court found that the risk of an erroneous

deprivation of property was high where the criminal case was filed and the defendant's property

was seized five years previously and the trial and appeals might take several years more.  777

F.2d at 1383-84.

Courts also have required a post restraint hearing to protect a criminal defendant's

Sixth Amendment right to counsel in cases where the defendant asserts that he needs access to

the restrained funds in order to pay defense counsel.  *E-Gold*, 521 F.3d at 421.[13]  Even so, the

D.C. Circuit in *E-Gold* expressly declined to go further.  "We need not determine, nor do we

determine, whether the due process rights of the defendants compel such a hearing when the

assets are not necessary to obtaining counsel of choice."  *Id*.  As a result of the uncertainty in this

area of law, courts tend to assume without deciding, that under certain circumstances a post

restraint hearing should be held.  *See e.g.*, *United States v. Melrose East Subdivision*, 357 F.3d

493, 500 (5th Cir. 2004) ("[W]e assume without deciding that due process can mandate a post-

restrain hearing under § 983(j)(1)(A), at least in certain circumstances"); *see also Kadi v.

Geithner*, No. 09-108, 2012 WL 898778, *23-24 (D.D.C. Mar. 19, 2012).

---

[13] The majority of the Circuits agree.  *United States v. Melrose East Subdivision*, 357 F.3d 493, 499 (5th Cir. 2004) (collecting cases); *but see United States v. Bissell*, 866 F.2d 1343, 1354 (11th Cir. 1989) (even where funds are needed to pay criminal defense counsel, a post restraint hearing is required *only if* a balancing test is satisfied).  Intervenors have not indicated that they require their assets in order to pay criminal defense counsel.  Even if they did, the Sixth Amendment would not be implicated since they are not being prosecuted in the United States.

Applying *Mathews v. Eldridge*, the Court here finds that the risk of an erroneous deprivation is high because the property was restrained years ago — in 2008 pursuant to the original restraining order[14] — and it may take several more years before the underlying criminal prosecutions and appeals are completed in Brazil.  Without deciding that Intervenors actually have a "right" to a post deprivation hearing, the Court will schedule a hearing.  By separate Order, the Court will set forth a briefing schedule regarding issues related to the hearing.

Intervenors also argue that putting the burden on them of showing a lack of due process in the foreign criminal prosecution is unfair and itself violates due process.[15]  To the contrary, this allocation of the burden of proof comports with due process and U.S. forfeiture law.  In criminal forfeiture proceedings, an individual who files a claim to the property has the burden of proving by a preponderance of the evidence that he has a superior right to the property or is a bona fide purchaser for value.  21 U.S.C. § 853(c), (n)(6); *see United States v. McHan*, 345 F.3d 262, 269-70 (4th Cir. 2003) (under 21 U.S.C. § 853, a third party may file a claim only after a defendant is sentenced; due process is not offended by limiting participation of third party claimants to post trial ancillary proceedings).  Similarly, in civil forfeiture proceedings, an innocent owner who files a claim bears the burden of proving innocent ownership by a preponderance of the evidence.  18 U.S.C. § 983(d)(1).

---

[14] *See* Restraining Order [Dkt. 2].

[15] Intervenors have not alleged that the Brazilian court proceedings fail to comply with U.S. notions of due process.  In fact, the proceedings in Brazil appear to meet the requirements of due process under U.S. law.  For example, criminal defendants in Brazil must be informed of the charges against them, are entitled to an attorney, have a right to be heard by a neutral judge, have the right to confront and cross examine witnesses, and may appeal through multiple levels. Dallagnol Aff. ¶ 5(1) – (8).

19

Intervenors further insist that the Accounts cannot be subject to the Brazilian Restraining Orders because the Accounts were held by corporations and the corporations are not, and cannot be, subject to prosecution in Brazil.  Yet Brazilian law does not concern itself with the location of the funds or with the identity of the current holders.  Instead, Brazilian law focuses on the source of the funds:  monies are forfeitable if they are the proceeds or the instrument of crime.  Dallagnol Aff. ¶ 5(12) ("[S]equestration, under Brazilian Law, is possible whenever there is a crime that bore assets. . . . [I]t is not important who is in possession of the assets when they are seized, but what is their origin."); Aras Aff. ¶¶ 65-66 (stating that Brazilian law provides that all assets owned or controlled by a criminal defendant may be restrained and upon conviction, the Brazilian court may order the forfeiture of an amount equal to the sum total of all offenses committed, together with any property that was used to commit an offense).  Brazilian legal officials have formally notified this Court that these specific Accounts are subject to forfeiture in Brazil if the criminal prosecutions of the Beneficial Owners are successful.  *See* Dallagnol Aff. ¶ (10) (forfeiture of the proceeds and instruments of crime is an effect of criminal conviction in Brazil).  For purposes of the U.S. Government's request for initial registration and enforcement of the Brazilian Restraining Orders, that notification is sufficient. [16]

---

[16] A § 2467 Proceeding cannot be used by a foreign criminal defendant to challenge a foreign restraining order on any ground that is the subject of litigation in the foreign court.  *See* 28 U.S.C. § 2467(d)(3)(C) ("No person may object to a restraining order under subparagraph (A) on any ground that is the subject of parallel litigation involving the same property that is pending in a foreign court.").  The beneficial owners of the Accounts and the corporations named on the Accounts may contest the restraining orders in Brazil, though they have not done so.  Dallagnol Aff. ¶ 5(10), (14), (17), (18).

### B. Dual Forfeitability

Intervenors contend that the United States has not submitted evidence of "dual forfeitability" as required in a § 2467 Proceeding. *See* 18 U.S.C. § 2467(a)(2)(A). Federal law limits enforcement of a foreign restraining order to instances in which the alleged violation of foreign law giving rise to forfeiture would constitute a violation of U.S. law that would give rise to forfeiture. The Government has satisfied the dual forfeitability requirement. The original application detailed the alleged illegal money transmitting activities involving the Accounts, *see* App. [Dkt. 1] at 10-16, and the Government has supported these allegations and provided more detail in the Dallagnol Affidavit. *See* Dallagnol Aff. ¶ 6. The Beneficial Owners of the Accounts are being prosecuted in Brazil for violations of laws against the operation of illegal or unlicensed financial institutions, conspiracy to commit criminal financial activity, and the laundering of proceeds of crime. *See* Brazilian Law 7492/86, Art. 4 (fraudulent operation of a financial institution), Art. 16 (operation of an unauthorized financial institution), Art. 22 (unauthorized money exchange operations); Brazilian Law 9613/98, Art. 1 (prohibiting concealment of origin and ownership of assets obtained via acts against the Brazilian financial system); Brazilian Penal Code § 288 (criminal conspiracy). The Accounts are subject to forfeiture in Brazil upon final conviction of the defendants there. *See* Dallagnol Aff. ¶ 6; Aras Aff. ¶¶ 62-66.

At least some of the underlying criminal conduct for these offenses, if committed in the United States, would violate U.S. criminal laws, namely 18 U.S.C. § 1956 (money

laundering) and § 1960 (unlicensed money remitting).[17]  For example, Ms. Nolasco pleaded

guilty to violations of § 1960 for her role in assisting the criminal defendants who are being

prosecuted in Brazil.  The assets subject to forfeiture in Brazil would be subject to forfeiture here

if the Brazilian defendants had committed similar crimes in the United States.  Criminal proceeds

traceable to illegal acts that violate 18 U.S.C. §§ 1956 and 1960 are subject to forfeiture under 18

U.S.C. § 981(a)(1)(A) and (C) and § 982(a)(1).   Intervenors' argument to the contrary is without

merit.

### C.  Ex Post Facto Clause and Retroactivity

Inasmuch as the law was amended during the course of this litigation, Intervenors

argue that a § 2467 Proceeding under the amended law constitutes a retroactive application of

criminal law and violates the Ex Post Facto Clause of the U.S. Constitution.  The Ex Post Facto

Clause forbids the making of a punitive law that applies retroactively.  U.S. Const. Art. I, § 9 cl.

3; *id.*, § 10 cl. 1; *Weaver v. Graham*, 450 U.S. 24, 28 (1981).   It applies to legislation that is

criminal or penal in nature, rather than civil or remedial.   *United States v. All Assets Held at

Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 7 (D.D.C. 2008).  Intervenors contend that the

2010 Amendment — which rewrote 18 U.S.C. § 2467(d)(3)(A) to allow restraining orders before

or after the initiation of foreign criminal or forfeiture proceedings — "imposes the punishment of

forfeiture for an act after its commission."  Opp. [Dkt. 69] at 15.

---

[17] The Beneficial Owners and the corporations named on the Accounts could be prosecuted here.
A foreign money transmitting business that engages in money laundering through use of a U.S.
bank account can be prosecuted under 18 U.S.C. § 1960, even though the business has no
physical presence in the United States. *See United States v. Mazza-Alaluf*, 621 F.3d 205, 210-11
(2d Cir. 2010).

The Ex Post Facto Clause requires determination of (1) whether Congress intended the statute to be punitive and (2) even if Congress called the statute "civil" instead of "criminal," whether the statute is "so punitive in purpose or effect as to negate [the] intention to call it 'civil.'"  *Smith v. Doe*, 538 U.S. 84, 92 (2003).  The answers to seven questions guide this analysis:

> (1) does the sanction involve an affirmative disability or restraint;[18]

> (2) has the sanction been historically regarded as a punishment;

> (3) is scienter required before the sanction comes into play;

> (4) will the sanction promote the traditional aims of punishment, retribution, and deterrence;

> (5) is the act to which the sanction applies already a crime;

> (6) could an alternative purpose to which it may rationally be connected be assigned to the sanction; and

> (7) does the sanction appears excessive in relation to the alternative purpose assigned?

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963).  These factors are not exhaustive, but they are "useful guideposts."  *Smith*, 538 U.S. at 97.

Intervenors argue that factors 2, 4, 5, 6, and 7 weigh in favor of finding that the 2010 Amendment is punitive.  They maintain that the seizure of a person's property historically has been viewed as punishment; the enforcement of a foreign government's criminal judgment serves as a deterrent; the behavior resulting in the restraint of property is defined as a crime, both in Brazil and in the United States; and the purpose of 18 U.S.C. § 2467(d)(3) is to freeze the

---

[18] An "affirmative disability or restraint" means imprisonment.  *United States ex rel. Sanders v. Allison Engine Co.*, 667 F. Supp. 2d 747, 752-53 (S.D. Ohio 2009).

proceeds of a crime to ensure that the monies are not spent, transferred, or hidden.  Intervenors

suggest that the alternative purpose of a § 2647 Proceeding (to hold property safe during criminal

prosecution) "far exceeds what is necessary to accomplish the alternative purpose as the seizure

is permitted to occur 'at any time' and the United States government has authority to freeze a

person's assets for a period that could be years . . . based solely on a foreign official's allegation

that the owner of the assets violated that country's law."  Opp. [Dkt. 69] at 19.  Intervenors insist

that most of the relevant factors favor a finding that the statute is punitive as applied here.  They

urge the Court to find that the law cannot be applied retroactively because to do so would violate

the Ex Post Facto Clause.

   This argument, however cogent, is contrary to all precedent and ultimately

unconvincing.  Congress intended the 2010 Amendment to be remedial, not punitive.  It viewed

the 2010 Amendment as a way to "close the loophole" and prevent criminals from shielding ill-

gotten assets.  156 Cong. Rec. H8539-01 (2010) at 8540.  The Supreme Court has long held that

U.S. forfeiture statutes are civil, not criminal, in nature.  In *United States v. Ursery*, 518 U.S. 267

(1996), the Court determined that Congress intended 18 U.S.C. § 981 and 21 U.S.C. § 881 to be

civil proceedings.  518 U.S. at 288.  The Court emphasized that forfeiture proceedings are *in rem*

against property and not *in personam* against a person.  It found "little evidence . . . that

forfeiture proceedings . . . are so punitive in nature as to render them criminal."  *Id*. at 290.  *See*

*also Julius Baer*, 571 F. Supp. 2d at 8 (applying forfeiture provisions to crimes committed before

statute was amended to include the relevant crimes as subject to forfeiture because forfeiture

proceedings are civil, not criminal).

In a similar manner, a § 2467 Proceeding was intended by Congress to operate as a civil action that may be complementary to, but not the same as, a criminal prosecution. *See UBS Fin. Servs.*, 2012 WL 1744463 at * 7. This conclusion is supported by the fact that a § 2467 Proceeding is *in rem* against the allegedly ill-gotten property and not against any person. Notably, it is located in Title 28, Chapter 163 of the U.S. Code, which includes other civil remedies. *See* 28 U.S.C. §§ 2461-67. Further, as discussed above, a court must ensure that a § 2467 Proceeding complies with the due process protections established by 18 U.S.C. § 983(j), which apply to civil matters in the United States. Because a § 2467 Proceeding is civil in nature, the limitations on criminal proceedings imposed by the Ex Post Facto Clause do not apply.

Whether the amended law can be applied retroactively is a different question. *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), set forth a two-step analysis to determine if a civil statute can be applied retroactively. First, if Congress expressly states that a new statute is intended to have retroactive effect, then it can be so applied. Second, if legislative intent is not clear, there is a presumption against retroactivity. 511 U.S. at 280. In that instance, a court must determine whether the new statute actually would have a retroactive effect, i.e., "whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.*

The statutory interpretation urged by Intervenors already was presented in a different context, unsuccessfully, to the Second Circuit in *United States v. Certain Funds Contained in Accounts Located at the Hong Kong and Shanghai Banking Corp.*, 96 F.3d 20 (2d Cir. 1996). *Hong Kong and Shanghai Banking* involved a civil forfeiture action under 28 U.S.C. § 1355(b), as amended, which allowed forfeiture of property in a foreign country that constituted

proceeds of drug smuggling.  The Second Circuit held that the amendment to 28 U.S.C.

§ 1355(b), which extended jurisdiction for civil forfeiture to property outside the United States,

applied retroactively without violating the Ex Post Facto Clause.  The Second Circuit determined

that the statute could be applied retroactively because it "would not take away any rights

possessed by a party, increase liability, or attach new legal consequences to past conduct."  96

F.3d at 24.

> The claimants never had any right to property resulting from illegal gains,
> and their alleged drug smuggling and money laundering have always
> carried criminal penalties.  One of the legal consequences of drug
> smuggling or money laundering is that the resulting illegal proceeds are
> subject to forfeiture to the government.

*Id*.

The 2010 Amendment to 28 U.S.C. § 2467 is analogous to the statutory amendment

addressed in *Hong Kong and Shanghai Banking*.  Because the 2010 Amendment does not

expressly state that it is retroactive, the Court decides whether it is truly retroactive.  Upon such

analysis, it is obvious that the 2010 Amendment does not impair any rights, does not increase

liability for past conduct, and does not attach new consequences to past conduct.  The Beneficial

Owners never had any legal right to property derived from their alleged crimes.  Moreover, the

criminal penalties under Brazilian law include forfeiture; this consequence is not changed in any

way by 28 U.S.C. § 2467, as amended.  In addition, a restraint of assets in the United States does

not increase the likelihood of conviction in Brazil, does not increase the severity of punishment

in Brazil, and does not render any conduct illegal that was previously legal in Brazil.  As noted,

the Brazilian Restraining Orders may be challenged by the corporations or the individuals in

Brazil.  Finally, the Court emphasizes that this is not a forfeiture case but merely a § 2467

Proceeding at the request of a treaty partner to restrain property that may be subject to forfeiture if certain persons are convicted of crimes in Brazil.

A further sound argument supports this § 2467 Proceeding. Statutes that enlarge or limit the jurisdiction of federal courts do not affect substantive rights but only address the power of a federal court to address a claim or dispute. *See Landgraf*, 511 U.S. at 274 ("We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed."). The Court finds that 18 U.S.C. § 2467 is such a jurisdictional rule, as it "grants federal courts jurisdiction to enforce foreign forfeiture and confiscation judgments" and "to enter such orders as may be necessary to enforce the [foreign] judgment." *Tiger Eye*, 613 F.3d at 1126. The 2010 Amendment, permitting the restraint of assets at the pre and post judgment stages of foreign proceedings, expands the temporal jurisdiction of U.S. courts to register and enforce foreign restraining orders. Before the 2010 Amendment, federal courts had authority to issue restraining orders on foreign request *only after* a foreign forfeiture judgment had been entered. *Id*. at 1126-27. As revised to provide wider temporal jurisdiction, 18 U.S.C. § 2467 does not affect substantive rights and is, therefore, not barred as having retroactive application.

### D. Harborside and Safeport Accounts

Intervenors Harborside and Safeport corporations assert that "there is no foreign forfeiture action" against them. Opp. [Dkt. 69] at 3. This claim is based on the fact that the underlying conviction of Beneficial Owner Mr. da Cunha Canto Kneese was "voided by a higher court in Brazil on the grounds that the judge who heard the case was incompetent." *Id*. at 2. Intervenors filed an affidavit of former Brazilian trial court judge Fernando Mottola, who

attested that the incompetence of a judge voids any decisions that judge made, as if the proceedings before him never took place.  *Id.*, Ex. A (Mottola Aff.) ¶¶ 7, 9, 14.  However, Intervenors do not dispute that, in the underlying case and in the context of Brazilian law, the term "incompetent" merely meant that the initial prosecution was in an "improper venue." Dallagnol Aff. ¶ 3(1), (2), (4).  The Regional Court of the 4th Region found that the trial court that convicted Mr. da Cunha Canto Kneese (the Court of the First Instance in Curitiba, State of Parana) was the wrong venue and ordered the case transferred to the Court of the First Instance in Sao Paulo, State of Sao Paulo.  Mottola Aff., Ex. A (Order of Regional Court of the 4th Region, dated May 19, 2011)  At the time the Mottola Affidavit was filed, no new case had been commenced against Mr. da Cunha Canto Kneese.  Mottola Aff. ¶ 14.  Since that time, however, the case was transferred, and most importantly, the Court of the First Instance in Sao Paulo ratified the restraining order previously issued against the Harborside and Safeport Accounts. Dallagnol Aff., Att. A (Order of Court of the First Instance in Sao Paulo, dated June 22, 2011). As a result, the fact that Brazilian prosecutors initially brought the case in the incorrect venue has no bearing on the validity of the restraining order against the Harborside and Safeport Accounts and does not undermine the Renewed Application to register and enforce the Brazilian Restraining Orders.[19]

---

[19] The only decision not ratified and adopted by the Sao Paolo Court was the determination of guilt.  The prosecution is still pending.  *See* Dallagnol Aff. ¶¶ 3(4), 6(2).

**IV.  CONCLUSION**

For the foregoing reasons, the Government's Renewed Application to register and

enforce the Brazilian Restraining Orders [Dkt. 59] will be granted.  The restraining Order issued

April 29, 2008 [Dkt.  2] is superseded by the accompanying Superseding Restraining Order.


Date:  November 9, 2012                                    _____/s/_____
                                                          ROSEMARY M. COLLYER
                                                          United States District Judge